# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

| | |
|---|---|
| **AMANDA BAGLEY** | **PLAINTIFF** |
| VS. | **CIVIL ACTION NO.** 3:24-cv-806-HTW-LGI |
| **HINDS COUNTY, MISSISSIPPI; HINDS COUNTY DETENTION CENTER; CITY OF CLINTON, MISSISSIPPI; CLINTON POLICE DEPARTMENT; CLINTON MUNICIPAL COURT; and JOHN AND JANE DOES 1-10** | **DEFENDANTS** |

## COMPLAINT
## *JURY TRIAL DEMANDED*

Plaintiff, AMANDA BAGLEY, by and through her undersigned counsel, filed this Complaint against Defendants, HINDS COUNTY, MISSISSIPPI, HINDS COUNTY DETENTION CENTER, CITY OF CLINTON, MISSISSIPPI, CLINTON POLICE DEPARTMENT, and CLINTON MUNICIPAL COURT and hereby alleges as follows:

### INTRODUCTION

1. AMANDA BAGLEY ("Ms. Bagley") is a deaf individual whose primary and preferred means of communication is American Sign Language ("ASL"). She requires an ASL interpreter to effectively communicate.

2. Despite Ms. Bagley's repeated requests, Defendants never provided ASL interpreters at any stage of her arrest, detention, court proceedings or thereafter. Throughout this process, Ms. Bagley was denied every form of reasonable accommodation, despite her consistent pleas for ASL interpretation.

3. Defendants discriminated against Ms. Bagley by withholding the reasonable accommodations necessary for her to understand and participate in her arrest, booking, detainment, court appearances, and subsequent incarceration.

4. As a result of Defendants' refusal to accommodate her deafness, Ms. Bagley experienced ongoing humiliation. Their actions caused her greater fear, anxiety, indignity, frustration, and emotional distress than a hearing person would ordinarily endure.

5. Ms. Bagley's experience reveals that Defendants have failed to enact proper policies, procedures, trainings, and practices addressing the communication needs of deaf individuals.

6. Through this lawsuit, Ms. Bagley seeks to compel Defendants to end their unlawful discriminatory practices and to implement effective policies ensuring deaf individuals receive full and equal access to Defendants' programs and services.

7. Ms. Bagley does not challenge the validity of her conviction, judgment, or imposed sentence.

8. Plaintiff seeks declaratory relief, monetary damages, nominal damages, and attorneys' fees to remedy Defendants' unlawful disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq.

## PARTIES

9. Plaintiff, AMANDA BAGLEY ("Plaintiff" or "Ms. Bagley"), is a 38-year-old individual currently residing in Hinds County, Mississippi. Ms. Bagley is profoundly deaf and communicates primarily in American Sign Language. She is substantially limited in the major life activities of hearing and speaking, and is a qualified person with a disability within the meaning of the ADA.

10. Defendant, HINDS COUNTY, MISSISSIPPI ("Hinds County"), is a political subdivision of the State of Mississippi, organized and existing under the laws of the State of Mississippi, with the capacity to sue and be sued. Hinds County is subject to the in personam jurisdiction of

this Court by service of process upon its Board of Supervisors, by and through the Hinds County Chancery Court Clerk, Eddie Jean Carr, who also serves as the Clerk of the Hinds County Board of Supervisors, located at the Hinds County Chancery Courthouse, 316 South President Street, Jackson, Hinds County, Mississippi 39201.

11. At all relevant times herein, Hinds County acted by and through its elected officials, agents, employees, and/or representatives, who were acting within the course and scope of their employment or official duties.

12. Defendant, HINDS COUNTY DETENTION CENTER ("HCDC"), is a detention facility located in Raymond, Mississippi, and operated and administered by Hinds County, Mississippi.

13. As a facility under the purview of Hinds County, HCDC is not a standalone legal entity under Mississippi law, but is named as a Defendant to the extent it can be sued through Hinds County, Mississippi.

14. At all relevant times, HCDC officials, officers, and/or staff acted within the course and scope of their employment as agents or employees of Hinds County.

15. Defendant, CITY OF CLINTON, MISSISSIPPI ("City of Clinton"), is a duly incorporated municipality of the State of Mississippi located in Hinds County, Mississippi. City of Clinton is subject to the in personam jurisdiction of this Court by service of process upon Mayor Phil Fisher, 300 Jefferson Street, Clinton, Mississippi, 39056.

16. At all relevant times herein, the City of Clinton acted by and through its elected officials, agents, employees, and/or representatives, who were acting within the course and scope of their employment or official duties.

17. Defendant, CLINTON POLICE DEPARTMENT ("CPD"), is an agency or department of the City of Clinton, responsible for law enforcement services within city limits.

18. CPD is not always considered a separate legal entity under Mississippi law but is named as a Defendant to the extent it may be sued through the City of Clinton.

19. At all relevant times, the CPD acted by and through its law enforcement officers, agents, and employees, who were acting within the course and scope of their employment or official duties.

20. Defendant, CLINTON MUNICIPAL COURT, is a local court of limited jurisdiction, established and operating under the authority of the City of Clinton and the State of Mississippi.

21. Clinton Municipal Court may not be a separate legal entity subject to suit, but is named as a Defendant to the extent it is legally responsible through the City of Clinton.

22. At all relevant times, Clinton Municipal Court judges, clerks, staff, and other personnel acted within the course and scope of their employment or official duties as agents or employees of the City of Clinton.

23. Defendants, JOHN AND JANE DOES 1-10, identities are unknown to the Plaintiff at this time. All allegations and claims asserted herein against the Defendants are incorporated herein by reference against John and Jane Does 1-10. These parties will be named and joined in this action, if necessary, once identified.

## JURISDICTION & VENUE

24. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for claims arising under Title II of the ADA, 42 U.S.C §§ 12131, et seq. This Court has supplemental jurisdiction over Plaintiff's state and local law claims under 28 U.S.C. § 1367.

25. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events that give rise to the claims occurred in the jurisdiction of the United States District Court for the Southern District of Mississippi.

## STATEMENT OF FACTS

26. Amanda Bagley is a deaf individual who communicates primarily in ASL and requires an ASL interpreter to effectively communicate.

27. American Sign Language, "the sixth most commonly used language in this country," is not a gestured form of English. "ASL is a mix of native signs and French sign language. Some words are finger-spelled, borrowed from English the same way that the words gourmet, roulette, and taco are borrowed from French and Spanish." And the native signs derive from "hand shape, palm direction, placement of the hand on the body or within the signing space, movement, and non-manuals (facial expressions)."[1]

28. In other words, "ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages." *U.S. E.E.O.C. v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1105 (9th Cir. 2010). "In many cases, there is no one-to-one correspondence between signs in ASL and words in the English language." *Id.*

29. Due to physical, environmental, and pedagogical factors, many deaf individuals, including Plaintiff, have difficulty acquiring English. Indeed, the majority of pre-lingually deaf individuals are not fluent in English, and the median reading level of deaf high school graduates is fourth grade.[2]

30. Many deaf people acquire English as their second language later in life—after ASL or another form of sign language—and well past the critical developmental period of language acquisition.

---

[1] D. Scheier, *Barriers to Health Care for People with Hearing Loss: A Review of Literature*, Journal of the New York State Nurses Association at 6, https://bit.ly/2QYg8T6 (internal citations omitted).

[2] *See* Jamie McAlister, *Deaf and Hard-of-Hearing Criminal Defendants: How You Gonna Get Justice If You Can't Talk to the Judge?*, 26 Ariz. St. L.J. 163, 180 n. 113 (1994).

31. Nor can deaf individuals, including Plaintiff, communicate effectively by reading a person's lips. Lip-reading or speech-reading—the ability to understand the speech of another by watching the speaker's lips—does not provide effective communication for deaf and hard of hearing individuals.[3] In fact, the upper limits of estimates for lip-reading accuracy have been as low as 10% to 30% of words correct.

32. Thus, "[t]o deny a deaf person an ASL interpreter, when ASL is their primary language, is akin to denying a Spanish interpreter to a person who speaks Spanish as their primary language. *Updike v. Multnomah Cty.*, 870 F.3d 939, 958 (9th Cir. 2017).

33. On or about October 17, 2024, Ms. Bagley was arrested by officers of the Clinton Police Department at 1428 Cadillac Drive in Jackson, Mississippi[4]. During the arrest, Ms. Bagley attempted to inform CPD officers that she is deaf and that she required a pen and paper to communicate. The CPD officers refused to grant this accommodation.

34. Because Ms. Bagley is deaf and could not hear the officers' verbal instructions, she was unable to fully comprehend what the officers were saying. The CPD did not provide an interpreter or otherwise suspend the booking process to secure someone who could communicate with Ms. Bagley. Instead, the officers expressed doubt concerning Ms. Bagley's disability, believing she was "faking."

35. Individuals present at the scene ultimately confirmed for CPD officers that Ms. Bagley is, in fact, deaf and that she relies on American Sign Language (ASL) to communicate. Nevertheless, she was arrested and detained without the assistance of an ASL interpreter

---

[3] *See* Michele LaVigne & McCay Vernon, *An Interpreter Isn't Enough: Deafness, Language, and Due Process*, 2003 WISC. L.REV. 843, 855 (2003)

[4] It should be noted that the Clinton Police Department report documenting this incident states that Ms. Bagley came to CPD to turn herself in. This is false.

36. Ms. Bagley was then transported to the Clinton Police Department in Clinton, Mississippi. Throughout the transport, Ms. Bagley repeatedly requested that an ASL interpreter be made available at the precinct so that she could communicate with law enforcement about her arrest.

37. Upon arriving at CPD, Ms. Bagley was booked and detained without an ASL interpreter. Although she requested one, no interpreter was provided to explain the nature of her arrest, the charges against her, her legal rights, or the terms and conditions of her detention.

38. Ms. Bagley remained in a holding cell for approximately four (4) days without an ASL interpreter and without the means to communicate with CPD personnel regarding the reasons for her arrest, her continued detention, or the next steps in the legal process.

39. On or about October 23, 2024, Ms. Bagley was brought to Clinton Municipal Court and met with a female court employee. At that time, two (2) documents were placed in front of her, but Ms. Bagley did not understand the content or significance of either document.

40. Using a writing utensil, the court employee indicated that one document constituted a "Not Guilty" plea. The employee wrote to Ms. Bagley that if she chose this option, she would likely "not get to go home."

41. The second document outlined a "Guilty" plea, and the court employee wrote that if Ms. Bagley pled guilty, she would likely be able to go home that same day.

42. Although Ms. Bagley asked for an ASL interpreter at this stage, no interpreter was provided to assist her in understanding the pre-trial proceedings or her options before the judge. Fearing she would otherwise remain in custody, Ms. Bagley felt compelled to sign the guilty plea document so that she could go home.

43. Ms. Bagley then appeared before Judge Darren Lamarca for a trial in Clinton Municipal Court regarding contempt of court charges stemming from a 2023 shoplifting violation. Although Ms. Bagley requested an ASL interpreter, none was provided. As a result, she could not

understand the judge's statements or the sentence ultimately imposed, which led to her incarceration at the Hinds County Detention Center.

44. Following sentencing, Ms. Bagley was detained and transported to Hinds County Detention Center without ever being provided an ASL interpreter. Consequently, she remained unable to comprehend her arrest details, the charges against her, her legal rights, the booking process, or the conditions of her confinement.

45. Upon arrival at HCDC, Ms. Bagley, again, requested an interpreter to explain to her what occurred in the court proceedings. Ms. Bagley again requested an ASL interpreter to clarify the outcome of the court proceedings. Although she repeated this request, no interpreter was supplied to explain her legal situation or the details surrounding her detention.

46. Only after Ms. Bagley encountered an HCDC employee who knew ASL was she provided any explanation of her recent criminal proceedings. Through that employee, Ms. Bagley finally received clarification about what had transpired in court.

47. Throughout the entirety of these events, Ms. Bagley repeatedly asked for an ASL interpreter so that she could understand the proceedings and communicate effectively. Despite these requests, her disability-related needs were consistently disregarded, leaving her without the basic ability to comprehend her legal circumstances.

48. Throughout these events, Defendants repeatedly declined to provide ASL interpretation services for Ms. Bagley, thereby failing to communicate her legal rights or to explain her custodial status in her primary language, American Sign Language.

49. During this entire process, Ms. Bagley was required to sign legal documents without the benefit of ASL interpretation.

50. Ms. Bagley is experiencing ongoing discrimination by Defendants because she remains detained at the Hinds County Detention Center.

51. Defendants' continued failure and refusal to provide effective communication to Ms. Bagley at every stage of the criminal justice process—including her arrest, booking, detainment, arraignment, release, and court proceedings—have left her isolated and uninformed, causing extreme confusion, stress, frustration, and psychological harm.

52. Defendants have failed to appropriately train or supervise their personnel regarding citizens' rights to be free from disability-based discrimination in the delivery of their services.

53. Defendants knew or reasonably should have known that the ADA and related state laws require them to provide reasonable accommodations, such as ASL interpreters, to qualified individuals with disabilities, yet they failed to establish or implement policies ensuring compliance with these statutes.

54. Defendants likewise knew or should have known of their obligation under the ADA and related state laws not to rely on family members as interpreters for deaf or hard-of-hearing individuals, yet they failed to develop policies or training addressing this requirement.

55. Defendants knew or should have known that their conduct and omissions created an undue risk of causing Ms. Bagley elevated fear, anxiety, humiliation, and emotional distress beyond what a hearing person would ordinarily experience.

56. By withholding effective communication, Defendants subjected Ms. Bagley to discriminatory treatment, forcing her to receive services that were objectively substandard and inferior to those provided to hearing individuals.

57. Due to Defendants' failure to offer effective communication, Ms. Bagley was deprived of the opportunity to fully and equally participate in all phases of her arrest, booking, detainment, and court proceedings.

58. The Defendants' deliberate and unlawful disability discrimination against Ms. Bagley is further evidenced by their failure to train staff and adopt non-discrimination policies for individuals who are deaf.

59. As a resident of Mississippi, Ms. Bagley anticipates potential future interactions with Defendants, whether by choice or necessity.

60. She is currently deterred from seeking Defendants' assistance or protection because she reasonably believes she will again face discriminatory treatment.

61. By intentionally disregarding Ms. Bagley's communication needs and acting with deliberate indifference, Defendants subjected her to humiliation, shame, fear, anxiety, and substantial emotional distress.

## FIRST CLAIM: VIOLATION OF AMERICANS WITH DISABILITIES ACT

62. Plaintiff incorporates all preceding paragraphs in support of this claim.

63. At all times relevant to this action, Title II of the ADA, 42 U.S.C. §§ 12131 et seq., has been in full force and effect and has applied to Defendant's conduct.

64. At all times relevant to this action, the United States Department of Justice regulations implementing Title II of the ADA, 28 C.F.R. Part 35, have been in full force and effect and have applied to the Defendants' conduct.

65. At all times relevant to this action, Ms. Bagley has been substantially limited in the major life activities of hearing and speaking, and is considered an individual with a disability as defined in the ADA, 42 U.S.C. § 12102(2).

66. Defendants are public entities as defined under Title II of the ADA, 42 U.S.C. § 12131(1).

67. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

68. Federal Regulations implementing Title II of the ADA state that a public entity may not "(i) deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; [or] (iii) provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1).

69. Federal Regulations implementing Title II of the ADA state that a public entity "shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1).

70. Federal Regulations implementing Title II of the ADA state that a public entity "shall furnish appropriate auxiliary aids and services where necessary," and "in order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b).

71. Title II of the ADA states that auxiliary aids and services include, but are not limited to, "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments." 42 U.S.C. § 12103.

72. Federal Regulations implementing Title II of the ADA provide examples of other effective methods of accommodation, such as qualified interpreters on-site or through video remote

interpreting ("VRI") services; real-time computer-aided transcription services; written materials; voice, text, and video-based telecommunications products and systems, including text telephones ("TTYs"), videophones, and captioned telephones, or equally effective telecommunications devices; and videotext displays. 28 C.F.R. § 35.104.

73. When determining what type of auxiliary aid and service is necessary, "a public entity shall give primary consideration to the requests" of the individual with the disability. 28 C.F.R. § 35.160(b)(2).

74. Federal Regulations implementing Title II of the ADA state that a public entity "shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication" except in an emergency or when the individual with a disability specifically requests the accompanying adult to interpreter. 28 C.F.R. § 35.160(c).

75. "[A] core purpose of Title II is for public entities to "accommodate persons with disabilities in the administration of justice." 46 F.4th 301, 306 (5th Cir. 2022). See also *Tennessee v. Lane,* 541 U.S. 509, 533, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004).

76. Defendants discriminated against Ms. Bagley on the basis of disability by excluding her from participation in and denying her the benefits of their services, and by subjecting her to discrimination, in violation of the ADA.

77. Defendants further discriminated against Ms. Bagley by failing to ensure effective communication through the provision of a qualified in-person interpreter.

78. Defendants' failure to provide effective communication to Ms. Bagley denied her the same access to Defendants' services, benefits, activities, programs, or privileges as the access provided to hearing individuals.

79. Defendants further discriminated against Ms. Bagley by failing to train their employees to accommodate disabled individuals and failing to modify discriminatory practices and procedures, as required by the ADA.

80. Defendants' violation of Plaintiff's rights under the ADA caused Plaintiff to suffer from discrimination, unequal treatment, and exclusion.

81. Plain and simple, Ms. Bagley was denied meaningful access to public services. "Lack of meaningful access is itself the harm under Title II, regardless of whether any additional injury follows." *Luke v. Texas*, 46 F.4th 301, 306 (5th Cir. 2022).

82. Further, Title II of the ADA incorporates the remedies the remedies set forth in 29 U.S.C. § 794a of the Rehabilitation Act. 42 U.S.C. § 12133.

83. In turn, 29 U.S.C. § 794a(a)(2) provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."

84. Accordingly, 29 U.S.C. § 794a(a)(2) provides that anyone bringing claims of discrimination against a recipient of federal funding may avail themselves of the remedies in 42 U.S.C. § 2000e-5(e)(3), which in turn states: "In addition to any relief authorized by section 1981a of this title . . . an aggrieved person may obtain [other] relief . . . ." 42 U.S.C. § 2000e-5(e)(3)(B) (emphasis added). And 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

85. As such, "any person aggrieved by any act or failure to act by any recipient of Federal Assistance . . . under section 794" is entitled to the "remedies, procedures, and rights" not

only in "title VI of the Civil Rights Act of 1964," but also in "subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5)." 29 U.S.C. § 794a(a)(2) (emphasis added).

86. 42 U.S.C. § 2000e-5(e)(3), in turn, authorizes certain relief "[i]n addition to any relief authorized by section 1981a," and 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

87. Plaintiff is also entitled to other forms of compensatory damages beyond emotional-distress damages because Defendants are subject to remedies traditionally available in suits for breach of contract. "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give her the benefit of his bargain by awarding her a sum of money that will, to the extent possible, put her in as good a position as he would have been in had the contract been performed." *Restatement (Second) of Contracts* § 347 cmt. A (Am. L. Inst. 1981). Here, when citizens like the Plaintiff interact with public entities like Defendants, they expect that they will be able to communicate with the public officials throughout the interactions.

88. Accordingly, Plaintiff had an expectation interest in the ability to fully participate in her own criminal proceedings, such as arrest, booking, detainment, and court proceedings.

89. Defendants denied Plaintiff this expectation interest by denying her the opportunity to be informed about and participate in her criminal proceedings. Accordingly, Plaintiff should be entitled to compensatory damages under her expectation interest.

90. Plaintiff is also be entitled to damages for dignitary harm[5]. Dignitary harms are those that interfere with the liberty or personal autonomy of the plaintiff, or that embarrass, humiliate,

---

[5] See *Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008) (concluding that a "past injury" includes a defendant's "discriminatory failure to ensure effective communication"). "There is no doubt that dignitary harm is cognizable; stigmatic injury is 'one of the most serious consequences' of discrimination." *Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 833–34 (7th Cir. 2019) (quoting Allen v. Wright, 468 U.S. 737, 755 (1984)).

or show blatant disrespect for the plaintiff, potentially leading to emotional distress. *Restatement (Third) of Torts: Remedies* § 22 TD No 2 (2023).

91. "Dignitary harm" and "stigmatic injuries" may be sufficiently concrete to constitute injury in fact. *Laufer v. Galtesvar OM, LLC*, No. 1:20-CV-00588-RP, 2020 WL 7416940. Stigmatic or dignitary injuries are available only to those persons who are personally denied equal treatment by the challenged discriminatory conduct. Ms. Bagley has certainly been denied equal treatment based on the Defendants' discriminatory conduct.

92. "A plaintiff personally denied equal treatment by the challenged discriminatory conduct has suffered a concrete injury . . . ." Id. at 834 (cleaned up). Thus, Plaintiff should be entitled to damages for dignitary harm. See *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 724 (8th Cir. 2003) ("[T]he mere fact of discrimination offends the dignitary interest that [civil rights laws are] designed to protect, regardless of whether the discrimination worked any direct economic harm to the plaintiffs.").

93. Plaintiff is therefore entitled to compensatory damages for the injuries and loss sustained as a result of Defendants' deliberate indifference as hereinbefore alleged, as well as an award of attorney's fees, costs, and disbursements, pursuant to the ADA, 42 U.S.C. § 12133.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against Defendants:

A. Enter a declaratory judgment against Defendants, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' policies, procedures, and practices have subjected Plaintiff to unlawful discrimination in violation of Title II of the Americans with Disabilities Act;

B. As to all Defendants, award to Plaintiff:

i. Compensatory damages pursuant to Title II of the ADA;

ii. Reasonable costs and attorneys' fees pursuant to the ADA;

iii. Interest on all amounts at the highest rates and from the earliest dates allowed by law;

iv. Any and all other relief that this Court finds necessary and appropriate, including nominal damages.

DATED: December 17, 2024

**DISABILITY RIGHTS MISSISSIPPI**
**ATTORNEY FOR PLAINTIFF**

*Greta K. Martin*

Greta Kemp Martin, MSB# 103672
Disability Rights Mississippi
5 Old River Place, Suite 101
Jackson, Mississippi 39202
Telephone: (601) 968-0600
Facsimile: (601)968-0665
gmartin@drms.ms